## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DANIEL TORONGO and BLUERIBBON COALITION, INC., <br><br>      *Plaintiffs*, <br><br> v. <br><br> DOUGLAS BURGUM, in his official capacity as Secretary of the Interior; BUREAU OF LAND MANAGEMENT; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, <br><br>      *Defendants*. | **COMPLAINT** <br><br> Case No. 5:25-cv-11263 |

Plaintiffs Daniel Torongo and BlueRibbon Coalition, Inc., seek relief from this Court against Defendants Douglas Burgum, in his official capacity as Secretary of the Interior, Bureau of Land Management, and the United States Department of the Interior and would show the Court as follows:

### INTRODUCTION

1.    In 1906, Congress passed the Antiquities Act to protect pueblo ruins and antiquities from amateur treasure hunters making claim to such antiquities. *The Antiquities Act: History, Current Litigation, and*

*Considerations for the 116th Congress*, CONG. RESEARCH SERV. (May 15, 2019) (hereinafter *The Antiquities Act*).

2.    The Act authorizes the President to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest . . . to be national monuments" and to set aside those lands in a manner that is confined to "smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(a), (b).

3.    The Act thereby explicitly puts a restriction on the President's authority to set aside federal lands to protect historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest.

4.    The first few national monuments created through the Antiquities Act were between 160 and 1,152 acres. *Antiquities Act at 1*.

5.    Over time, Presidents began creating larger monuments. As noted by Chief Justice Roberts, between 2006 and 2021 "[p]residents have established five marine monuments alone whose total area exceeds that of all other American monuments combined." *Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980 (2021) (Roberts, C.J., statement respecting the denial of certiorari).

6.    Near the end of his presidency, former President Biden disregarded the constraints of the Antiquities Act and designated approximately 624,000 acres of the Chuckwalla region as a national

monument. Proclamation No. 10881—Establishment of the Chuckwalla Nat'l Monument, 90 Fed. Reg. 6715 (2025).

7.    That proclamation  describes the Chuckwalla region as: the site of various wildlife in need of protection; the location of previous Apollo 13 and 15 crew training; the location of Camp Young, where administrative buildings once but no longer stand; an area where the U.S. Fish and Wildlife Service are considering reintroducing the Sonoran Desert pronghorn; and a place of "trails, of which physical traces remain . . . that Tribes and Indigenous peoples evoke and visit through songs and dreams."

8.    The proclamation places the most emphasis on the "religious, spiritual, historic, and cultural significance for Tribal Nations." *Id.*

9.    According to the proclamation, many sites are not easily accessible and are concealed by rugged canyons. *Id.*

10.    Although only a "small fraction" of the land has been formally inventoried, the proclamation claims that there may be artifacts "yet to be discovered." *Id.*

11.    The Chuckwalla National Monument designation is unlawful because the Chuckwalla region cannot be understood as an "object" under the Antiquities Act.

12.    Similarly, the hodgepodge justification that includes various species, non-existent buildings, undiscovered antiquities, the possibility of reintroduction of an animal to Chuckwalla, and obliterated trails of

significance are not objects themselves and cannot be consolidated to make the Chuckwalla region an "object" under the Antiquities Act.

13.    If the Chuckwalla region, as a whole, can be understood to be an "object" under the Antiquities Act, then the limitation placed on the president in the Act is meaningless.

14.    If that reading is correct, then the Antiquities Act violates the Property Clause of the Constitution because it delegates an enumerated power of Congress to the Executive, in violation of the separation of powers.

## **PARTIES**

15.    On January 14, 2025, former President Joseph Biden issued a proclamation declaring 624,000 acres of the Chuckwalla desert a national monument.

16.    Plaintiff Daniel Torongo has a valid and long-standing mining claim within the territory designated as the Chuckwalla National Monument.

17.    Mr. Torongo's family has been mining in the territory since 1978.

18.    Mr. Torongo had plans to continue mining in the territory, especially during his retirement.

19.    Mr. Torongo has a significant financial interest in maintaining his mining claim.

20.     The proclamation burdens Mr. Torongo's mining in the monument's territory.

21.     The proclamation's declaration that the monument will be subject to historic mining operations and valid existing rights is insufficient to protect Mr. Torongo's mining interests within the territory.

22.     The national monument designation interferes with Mr. Torongo's mining claim by increasing restrictions and regulations to maintain his claim and will keep him from expanding his claim to nearby areas, as he has long planned.

23.     Mr. Torongo is a full-time resident of Brighton, Michigan.

24.     Except for a brief period in the 1980s, Mr. Torongo has been a resident of Michigan his entire life.

25.     Plaintiff BlueRibbon Coalition ("BRC") is a 501(c)(3) non-profit that has worked to protect public recreation access to public lands through legislation, outreach, education, and litigation since 1987.

26.     BRC has members that recreate on public lands throughout the country, including the Chuckwalla region.

27.     BRC has members that are prevented from enjoying use of all the same trails due to closures to uncharted trails and other temporary closures.

28.    The national monument designation interferes with the ability of members of BRC to drive, hike, and otherwise explore trails within the national monument.

29.    Defendant Douglas Burgum, sued here in his official capacity, is the Secretary of Interior and oversees management of the Chuckwalla National Monument through the Bureau of Land Management.

30.    Defendant U.S. Department of the Interior is a federal agency responsible for enforcing, administering, and overseeing federal rules and regulations in connection with the Chuckwalla National Monument.

31.    Defendant Bureau of Land Management is a federal agency managed by the Department of the Interior, and responsible for overseeing, enforcing, administering, and creating a management plan for Chuckwalla National Monument.

## JURISDICTION AND VENUE

32.    This is an action arising under the Antiquities Act of 1906 (54 U.S.C. § 320301) and the Property Clause of the United States Constitution (U.S. Const. art IV, cl. 2).

33.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 57. Equitable relief is authorized under this Court's inherent equitable powers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

34.    There is an actual controversy between the parties concerning the lawfulness of the Chuckwalla National Monument designation. Plaintiff's injuries are concrete and particularized as a result of the designation. And those injuries are redressable by this Court.

35.    A person "suffering legal wrong because of agency action or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

36.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C).

## FACTUAL ALLEGATIONS

A.    *The Property Clause of the U.S. Constitution and Separation of Powers*

37.    The Property Clause of the Constitution assigns Congress the power to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." See U.S. Const. art. IV, § 3, cl. 2.

38.    If Congress delegates unlimited authority to exercise one of its enumerated powers without an intelligible principle, it is a violation of the nondelegation doctrine and separation of powers. *J. W. Hampton, Jr., & Co. v. United States*, 276 U. S. 394, 409, 48 S. Ct. 348, 72 L. Ed. 624, Treas. Dec. 42706 (1928).

## B. *The Text of the Antiquities Act*

39. The Antiquities Act of 1906 provides for the creation of national monuments by presidents. It states that the "President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." 54 U.S.C. § 320301(a).

40. Another provision of the Act provides a limitation to the President's authority, which states that the "President may reserve parcels of land as a part of the national monuments," so long as those "parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected." *Id.* § 320301(b).

41. Additionally, the Act is closely related to a federal enforcement provision, which states "[a] person that appropriates, excavates, injures, or destroys any historic or prehistoric ruin or monument or any other object of antiquity that is situated on land owned or controlled by the Federal Government without the permission of the head of the Federal agency having jurisdiction over the land on which the object is situated, shall be imprisoned not more than 90 days, fined under this title, or both." 18 U.S.C. §1866(b).

42. The Antiquities Act has remained effectively the same since its adoption. *Compare* Pub. L. No. 59-209, 34 Stat. 225 (1906).

C.   *The Legislative History of the Antiquities Act*

43.   The Antiquities Act was adopted by Congress to prevent amateur treasure hunters and archeologists from excavating valuable artifacts and depriving the public of such discoveries. *See* Hal Rothman, *Preserving Different Pasts* 1-33 (1989).

44.   The process of drafting the legislation that would eventually become the Antiquities Act began in 1899.   Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906* 37 Ga. L. Rev. 473, 478 (2003).

45.   Legislation was discussed and debated until its enactment in 1906, with conflict over the breadth of authority granted to the president to determine the size of land set aside being a core issue throughout these years. *Id.* at 478-486.

46.   Although some members of Congress advocated for a broader grant of authority to the president, it is clear the majority of Congress strongly opposed giving the president unlimited discretion to determine how large national monuments should be. *Id.*

47.   Most commentators agree that the Act was intended only to protect small tracts of land around archeological sites. *Id*. at 477.

48.   In early 1900, a draft bill with broad language was considered alongside two competing bills that were much narrower in scope, with one explicitly limiting national monuments to 320 acres and only in order to protect prehistoric ruins. *Id.* at 479.

49.    All three bills were sent to the Secretary of Interior, who passed them on to the Commissioner of the General Land Office, who was unsatisfied with all three bills and proposed a new bill with exceedingly broad language, granting the president authority to:

> [s]et apart and reserve tracts of public land, which for their scenic beauty, natural wonders or curiosities, ancient ruins or relics, or other objects of scientific or historic interest, or springs of medicinal or other properties it is desirable to protect and utilize in the interest of the public; and the President shall, by public proclamation, declare the establishment of such reservations and the limits thereof. *Id.*

50.    This proposed bill was strongly resisted in committee due to the expansiveness of the language. *Id.* at 481.

51.    Chairman of the House Committee on Public Lands, Representative Bill Lacey, stated that it "seemed to be unanimously of the opinion that it would not be wise to grant authority in the Department of the Interior to create National Parks generally, but that it would be desirable to give the authority to set apart small reservations, not exceeding 320 acres each . . ." Ronald F. Lee, THE ANTIQUITIES ACT OF 1906, U.S. Dept. of Interior 55 (Nov. 16, 1970).

52.    Another version of the legislation that included a provision clearly limiting the president's authority to create national monuments confined to the "smallest area compatible" with the protection of the object was considered. The Representative Lacey, answered the following

questions about how large of a monument the president could create under the Antiquities Act:

> Mr. STEPHENS of Texas: How much land will be taken off the market in the Western States by the passage of the bill?
>
> Mr. LACEY: Not very much. The bill provides that it shall be the smallest area necessary [sic] for the care and maintenance of the objects to be preserved.
>
> Mr. STEPHENS of Texas: Would it be anything like the forest-reserve bill, by which seventy or eighty million acres of land in the United States have been tied up?
>
> Mr. LACEY: Certainly not. The objective is entirely different. It is to preserve these old objects of special interest and the Indian remains in the pueblos of the Southwest, whilst the other reserves the forests and the water courses. (40 Cong. Rec. 7,888 (1906)).

53.    While the bill giving the president unlimited discretion was rejected specifically for its expansiveness, this later version with a limit to the president's authority was passed by both houses. Squillace, *supra*, at 484.

54.    The House Report on the legislation distinctly acknowledged the purpose of this limitation, stating "The bill proposes to create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times." H.R. Rep. No. 59-2224.

55.    And the Senate Report stated that bill was "carefully drawn" to protect "the historic and prehistoric ruins and monuments on the public lands of the United States [that] are rapidly being destroyed." S. Rep. No. 59-3797, at 1 (1906).

56.    Early national monument designations operated with this understanding and were more concise than more modern national monument proclamations and described the objects to be protected.

57.    Devils Tower, the first monument created under the Act was originally 1,153 acres and two that followed were around 160 acres each. The Antiquities Act, *supra*, at 7.

58.    Designations made by the president through the Antiquities Act do not require any kind of notice and comment process and, unlike other changes initiated by government agencies, designations under the Antiquities Act do not require compliance with the National Environmental Policy Act (NEPA) or other similar laws. Nat'l Monuments & the Antiquities Act, CONG. RESEARCH SERV. (Jan., 30 2017).

D.    *The Expansion of the Antiquities Act and the Creation of the Chuckwalla National Monument*

59.    Soon after the enactment of the Antiquities Act, presidents began designating larger and larger swaths of land.

60.    In recent decades, "[p]residents have established five marine monuments alone whose total area exceeds that of all other American monuments combined." *Mass. Lobstermen's*, 141 S. Ct. at 980.

61.    Through the Antiquities Act, President Clinton designated almost 1.7 million acres for the Grand Staircase-Escalante National Monument, President Bush designated almost 61 million acres as the underwater Marianas Trench Marine National Monument, and President Obama designated 1.3 million acres for the Bear-Ears National Monument. The Antiquities Act, *supra*, at 8.

62.    On January 14, 2025, former President Biden established the Chuckwalla National Monument.

63.    The Chuckwalla National Monument covers over 624,000 acres of southeastern California desert where the Mojave and Colorado Deserts intersect and contains five geographically discrete areas. Proclamation No. 10881, 90 Fed. Reg. 6715 (2025).

64.    The Chuckwalla National Monument borders the already expansive Joshua Tree National Park, which is 795,156 acres.



65. The boundaries of the Chuckwalla National Monument include over 100,000 additional acres of private property, the majority of which is clustered together against the boundary line in the southern part of the park, making up the checkered area in the map above. *Chuckwalla Nat'l Monument*, BUREAU OF LAND MGMT. (Jan. 16, 2025), https://www.blm.gov/programs/national-conservation-lands/california/chuckwalla#:~:text=Of%20the%20nearly%20740%2C00 0%20acres,in%20Riverside%20and%20Imperial%20counties.

14

66.     Property owners are concerned about the motivation behind including such a significant portion of private land that could have easily been excluded from the park.

67.     One such concern is that they will lose access to roads used to get to their property. *Chuckwalla Nat'l Monument*, BUREAU OF LAND MGMT. (Jan. 16, 2025), https://www.blm.gov/california/public-room/map/chuckwalla-national-monument-map.

68.     The proclamation establishing the monument lists various characteristics of the land but does not give any explanation for why these characteristics require such an expansive designation to protect them, or what land is required to protect what objects or characteristics. Proclamation No. 10881, 90 Fed. Reg. 6715 (2025).

69.     By not doing so, the proclamation seems to designate Chuckwalla itself as the object to be protected by the Antiquities Act, rather than the characteristics described as existing on the land.

70.     Some characteristics of the proclamation are listed as needing protection and other characteristics are listed as describing Chuckwalla with no explanation for why the characteristics would need protection.

71.     For instance, the proclamation states that Chuckwalla is home to mountain ranges that "embody a fundamental story of our world that scientists are still learning to decipher," but fails to explain if these mountain ranges are objects to be protected by the designation, or why

15

these mountain ranges, as opposed to other mountain ranges, need protection. *Id.*

72.    The proclamation does not clarify how the designation is confined to the smallest area compatible with the protection of the mountain ranges. *Id.*

73.    Like nearly all swaths of public land, Chuckwalla is home to "an array of plant and animal species." This includes mesquite beans, bighorn sheep, Chuckwalla cholla, a desert tortoise, various desert trees, migratory birds, Gila woodpeckers, rare owls, bats, lizards, and kit foxes. *Id.*

74.    The proclamation does not clarify how the designation is confined to the smallest areas compatible with the protection of these plants and animals, which exist with varying levels of rarity, from endangered to extremely common. *Id.*

75.    The proclamation also describes characteristics left behind by Indigenous groups. *Id.*

76.    While some of these characteristics are tangible artifacts, others are more theoretical or evoke a general sacredness hovering over the Chuckwalla region, again suggesting that despite mention of some objects, the proclamation truly seeks to designate Chuckwalla itself as an object worth protecting.

77.    For example, the proclamation states that the trails weaving through the canyons "were, and are, essential to the people who trace

their origins to these lands, and provide a sense of connection between generations and between the physical and spiritual worlds." *Id.*

78.    The proclamation states that two trails, of which "physical traces remain, are both ancient and modern, tangible places and passages that Tribes and Indigenous peoples evoke and visit through songs and dreams . . . While the Salt Song Trail can betraveled by foot, traditional singers also travel this trail by voice through songs passed down across generations and that Tribes and Indigenous peoples believe assist the transport of the spirits of the recently deceased" making it unclear how much of the trail physically remains and to what extent it needs to be protected physically for its scientific or historical significance rather than for a type of metaphysical significance the Antiquities Act was not meant to protect. *Id.*

79.    Of the artifacts the proclamation seeks to protect, the Chuckwalla National Monument goes beyond protecting known, tangible artifacts and claims to protect unknown artifacts and historic sites "yet to be discovered." *Id.*

80.    The Chuckwalla National Monument is also described as the site of a Desert Training Center, but all that remains of that facility is tank tracks and remnants of concrete fountains and rock-lined walkways. *Id.*

81.   All 100 administrative buildings, two hospitals, 50 warehouses, theater, officers' club, and post office buildings have been destroyed or removed. *Id.*

82.   The monument boundaries are not confined to the smallest area compatible with the protection of these alleged ruins. *Id.*

83.   The proclamation states "the boundaries of the monument reserved by this proclamation represent the smallest area compatible with the proper care and management of the objects of historic or scientific interest identified above, as required by the Antiquities Act," but the proclamation is altogether unclear about what characteristics described above are real, tangible objects being protected and what are merely features of the arid desert landscape of the Chuckwalla region. *Id.*

84.   The proclamation further states that it may protect objects regardless of whether or not they are expressly named by the proclamation:

> Whereas, I find that all the objects identified above, and objects of the type identified above within the area described herein, are objects of historic or scientific interest in need of protection under section 320301 of title 54, United States Code, regardless of whether they are expressly identified as objects of historic or scientific interest in the text of this proclamation. *Id.*

85.   President Biden's proclamation designating Chuckwalla as a National Monument points to history, vegetation, wildlife, tribal

significance, and potential archeological discoveries as reason to protect the whole Chuckwalla region, suggesting that the vast landscape itself is the object to be protected rather than each characteristic on its own.

86.    Furthermore, even if the objects indicated in the proclamation are truly intended to be protected by the designation, it does not clarify what swaths of land are needed to protect what objects let alone how that land is to be confined to the smallest area compatible with the protection of these objects.

87.    Moreover, some characteristics of the Chuckwalla region that the proclamation suggests are worthy of protection are not valid objects under the Antiquities Act. *Id.*

88.    The proclamation states that:

> All Federal lands and interests in lands within the boundaries of the monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws, other than by exchange that furthers the protective purposes of the monument or that facilitates the remediation, monitoring, or reclamation of historic mining operations on public or private land within the monument boundary; from location, entry, and patent under the mining laws; and from disposition under all laws relating to mineral and geothermal leasing. *Id.*

89.    The proclamation does not define what constitutes "historic mining." *Id.*

19

90.    The proclamation states that the monument is subject to "valid existing rights," but does not give guidance on what constitutes a *valid* existing right. *Id.*

91.    This is relevant because, by way of example, the presidential proclamation designating Bears Ears as a national monument also included a provision stating that the designation was subject to valid existing rights, but miners were concerned that they could not mine where they had claims for fear of repercussions and due to increased regulations adopted in the aftermath of the designation. Indeed, after the creation of the monument, the Bureau of Land Management implemented a scheme under which, for all claims that pre-date the Bears Ears National Monument, miners must pay for an exam which tests the validity of the claim. *See* Compl.¶ 119-120, *Dalton v. Biden* No. 4:22-cv-00060-DN, (D. Utah 08/25/22). For some miners, this exam can cost as much as $100,000 per claim. *Id.*

92.    The Chuckwalla proclamation states that the monument will be managed by the Secretary of the Interior through the Bureau of Land Management in accordance with the terms of the proclamation.

93.    This includes developing a management plan for the lands within three years of the proclamation which will take into account "maintaining the undeveloped character of the lands," "minimizing impacts from surface-disturbing activities," and "emphasizing the

20

retention of natural quiet, dark night skies, and scenic attributes of the region." *Id.*

94.    Although the proclamation provides that the management plan may consider improving public access to the land for recreationists, the proclamation also states that "motorized vehicle use in the monument may be permitted only on roads and trails documented as existing in BLM route inventories that exist as of the date of this proclamation." *Id.*

E. *Plaintiff Daniel Torongo: A Third-Generation Miner at Chuckwalla*

95.    Daniel Torongo lives in Detroit, Michigan and has generational mining ties to the Chuckwalla region of southern California.

96.    Mr. Torongo's family started mining in the area in 1981, when Mr. Torongo's grandfather, Jack Torongo, purchased his first mining claim in Riverside County.

97.    Jack Torongo built his own mining company, "Canyon Minerals," which operated within the Chuckwalla mountains for several years.

98.    Mr. Torongo's father, a geologist and military trained heavy equipment operator helped develop the claims and worked for the company as well.

99.    When the price of gold decreased, and mining was no longer profitable, Mr. Torongo's family pulled back from their mining activities

but retained their claims for several years before creating three eight-member association claims, each about 160 acres.

100. Currently Mr. Torongo holds two claims. One encompasses the Talking Rock Wash Mill site, covering five acres with a center post and four clearly marked corners. The other claim to the north of the first claim covers twenty acres and also has a center post and four clearly marked corners.

101. Mr. Torongo has a third claim for which the paperwork is currently being processed. This claim, the "Scruffs claim," is 160 acres.

102. Mr. Torongo submitted paperwork and payment to relocate the third claim at the end of April 2025, and the payment was cashed by BLM.

103. However, considering the requirements enforced against miners in other national monuments, Mr. Torongo worries that the claim will later be rejected since the paperwork was submitted after the monument designation.

104. The designation of the Chuckwalla National Monument adds a degree of risk if regulations are not perfectly adhered to.

105. Miners must comply with various paperwork to maintain their claims, and because the proclamation only claims to protect existing rights, if that right is called into question, there is less room for miners like Mr. Torongo to correct errors in paperwork.

106.  Due to the monument designation, Mr. Torongo will have to maintain his claims even when the cost of gold dips and mining is unprofitable, since the designation will presumably prevent miners from reacquiring claims in the future.

107.  Besides his current claims, Mr. Torongo hoped to acquire two additional 160 acre claims to expand his efforts.

108.  He was particularly interested in spending more time mining in Chuckwalla after his retirement and planned to spend more time there with his family.

109.  Acquiring these claims is now impossible given the monument designation.

110.  Although Mr. Torongo and his family have invested time and money in acquiring claims, equipment, and relevant knowledge, the dream of expanding their operation beyond its current size is no longer possible.

111.  When Mr. Torongo and his family travel to Chuckwalla for their mining activities they also engage in other recreational activities that will be impacted by the national monument designation.

112.  They typically bring a twenty-five-foot camper to camp at the mill site of one of their claims. Their family activities include dirt biking, off-roading, hiking, target shooting, rock hounding, and sitting by a campfire at night.

113. When they leave Chuckwalla, they often must perform road improvements by filling in ruts to get through the territory.

114. The national monument designation will control what trails they can explore because the proclamation declared that all unrecorded trails would be closed to recreationists and could lead to temporary closures of recorded trails as well, depriving Mr. Torongo and his family from the same level of exploration and enjoyment.

115. Based on similar national monuments, Mr. Torongo has reason to believe the management plan will further restrict his activities.

116. As explained above, in the Bears Ears National Monument, BLM requires miners to pay for exams to prove the validity of their claims and these exams cost about $100,000 each.

117. This uncertainty of imminent and potentially costly regulations has an immediate impact on Mr. Torongo's ability to plan for the future of his mining and recreational activities, besides the already certain impact the proclamation has had.

F.  *Plaintiff BlueRibbon Coalition: A Nationwide Group of Motorized Recreation Enthusiasts*

118. BlueRibbon Coalition is a 501(c)(3) non-profit organization, established in 1987, that exists to advocate on behalf of recreationists and preservation of public land for public use through education, legislation, and litigation.

119. BRC's membership is made up of recreationists and advocates from all 50 states, including members in the Detroit area of Michigan. Members of BRC include mountain bikers, dirt bikers, rock climbers, ATV and off-roaders, related small business owners and more. They also include individuals with various backgrounds such as veterans and the disabled.

120. BRC's members also include individuals that have used and plan to use the trails within Chuckwalla. Given the proclamation's goal of maintaining the undeveloped character of the land, and minimizing the impact of surface level disturbances, recreationists that enjoy off-road vehicle recreation fear they will face additional closures and costly regulations consistent with the pattern of other national monument designations.

121. Besides preventing enjoyment of the land, the designation may also harm BRC members financially, as many of them have invested significant amounts of money in off-roading vehicles and equipment.

## COUNT I
## THE PROCLAMATION VIOLATES THE ANTIQUITIES ACT
### 54 U.S.C. §§ 320301-320303

122. President Biden exceeded his statutory authority under the Antiquities Act by establishing the Chuckwalla National Monument because the authority granted to the president is to declare by public proclamation historic landmarks, historic and prehistoric structures, and

other objects of historic or scientific interest that are situated on federal lands, 54 U.S.C. § 320301(a), and the entirety of the Chuckwalla region is not an object.

123.  An object cannot be understood to be a region based on the ordinary meaning of the word "object" in the context of the Act or the legislative history of the Act.

124.  Because the word "object" is not defined by the statute, it must be read it light of its ordinary meaning at the time of enactment. *See Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021).

125.  There are various definitions of the word "object," but no ordinary meaning of object can comport with definitions of region, especially considering that a region can be defined so broadly as to be "an indefinite area of the world or universe." "Region," MIRRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/region.

126.  The structure of the Act suggests that an "object" cannot be a region because the use of the word "other" suggests that "other objects" must be akin to "historic landmarks" and "historic and prehistoric structures," but not subsume those features. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001); *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022).

127.  A region is not akin to "historic landmarks" and "historic and prehistoric structures."

128. Additionally, the Act's language describing objects as being "situated to the land" and "confined to the smallest area compatible" with protection also make it impossible to reasonably interpret an "object" to be a region because a region is not "situated on the land," it *is* the land

129. Even if the Chuckwalla National Monument seeks to protect objects listed within the proclamation, the Chuckwalla National Monument exceeds presidential authority and is unlawful because a variety of objects listed cannot be consolidated to make the 624,000 acres of Chuckwalla a single "object" to be protected under the Antiquities Act.

130. The Chuckwalla National Monument exceeds presidential authority by attempting to protect indiscriminate objects; objects not expressly listed in the proclamation; and objects "yet to be discovered."

131. The Chuckwalla National Monument also exceeds the President's authority under the Antiquities Act because neither Chuckwalla, nor the items listed as objects within the monument, are confined to the "smallest area compatible" with the protection of an object able to be protected under the Antiquities Act. 54 U.S.C. § 320301(b).

132. A person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

133. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the establishment of the Chuckwalla National Monument that can be redressed by the court.

27

134.  Plaintiffs have no adequate remedy at law.

## COUNT II
### THE ANTIQUITIES ACT VIOLATES
### ART. IV, § 3, CL. 2.  OF U.S. CONSTITUTION

135.  The Property Clause, art. IV, § 3, cl. 2, of the U.S. Constitution, provides, at relevant part, that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]"

136.  The Chuckwalla National Monument consists of territory that is property of the United States and is therefore subject to the Property Clause.

137.  The disposition of federal property is entrusted to Congress, and only to Congress, by the Property Clause of the Constitution.

138.  It is a violation of the Property Clause for Congress to delegate to the president the unilateral power to declare vast (and possibly unlimited) amounts of federal land as national monuments. Such delegation lacks any intelligible principle or appropriate limitations on the president's power. *J. W. Hampton, Jr., & Co. v. United States*, 276 U. S. 394, 409, 48 S. Ct. 348, 72 L. Ed. 624, Treas. Dec. 42706 (1928).

## COUNT III
### THE DESIGNATION VIOLATES
### THE MAJOR QUESTIONS DOCTRINE

139.  The Under the language of the Antiquities Act, the president's asserted authority to designate a region, and many other objects that do

not conform to the Antiquities Act's ordinary meaning, violates the major questions doctrine.

140. The major questions doctrine seeks to protect against "unintentional, oblique, or otherwise unlikely" intrusions on . . . "basic questions about self-government, equality, fair notice, federalism, and the separation of powers" by ensuring that, when agencies seek to resolve major questions, they at least act with clear congressional authorization and do not "'exploit some gap, ambiguity, or doubtful expression in Congress's statutes to assume responsibilities far beyond' those the people's representatives actually conferred on them." *West Virginia v. EPA*, 597 U.S. 697, 742.

141. The doctrine applies when the Executive Branch claims the power to resolve a matter of "political significance," that is properly decided by Congress.

142. The designation, as a national monument, of over 600,000 acres of California desert is a political matter for which there is no clear congressional authorization.

## **PRAYER FOR RELIEF**

Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, it is appropriate and proper that a declaratory judgment be issued by this Court, declaring that the establishment of the Chuckwalla National Monument is contrary to the Constitution and federal statute.

Furthermore, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that the Court issue a permanent injunction prohibiting Defendants from enforcing any of the terms and conditions, related to the Chuckwalla National Monument, contained in Presidential Proclamation 10881 of January 14, 2025.

WHEREFORE, Plaintiffs pray for judgment against Defendants and that the Court:

(1) Declare that Proclamation Concerning the establishment of the Chuckwalla National Monument violates Antiquities Act of 1906 (54 U.S.C. § 320301); the Property Clause of the United States Constitution (U.S. Const. art IV, cl. 2); and the major questions doctrine;

(2) Hold unlawful and set aside the creation and establishment of the Chuckwalla National Monument;

(3) Issue a permanent injunction against Defendants, as well as all agents, administrators, employees, or other persons acting on behalf of the Defendants from enforcing the terms of the Proclamation Concerning the Establishment of the Chuckwalla National Monument, including any and all subsequent monument planning activities;

(4) Award Plaintiffs their costs and expenses incurred in bringing this action, including, but not limited to, reasonable attorney fees pursuant to 28 U.S.C. § 2412; and

(5) Grant such other and further relief as the Court deems equitable, just, and proper.

Date: May 1, 2025

Respectfully submitted,

*/s/ Matthew Miller*
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
MATTHEW MILLER
Texas Bar No. 24046444
mmiller@texaspolicy.com
ANELISE POWERS
California Bar No. 334883
apowers@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
(512) 472-2700